## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>DOTS, LLC, *et al.*,<br><br>     Debtors. | Chapter 11<br><br>Case No. 14-11016 (MBK)<br><br>Jointly Administered |
| DOTS, LLC, *et al.*,<br><br>     Plaintiffs,<br><br>v.<br><br>MILBERG FACTORS, INC.,<br><br>     Defendant. | Adv. Pro. No. 14-1818 (MBK)<br><br>Hearing Date: October 24, 2016<br>     at 1:00 PM |

---

# DEBTORS' MEMORANDUM OF LAW IN SUPPORT
# OF MOTION FOR PARTIAL SUMMARY JUDGMENT

---

**TRENK, DiPASQUALE, *ET AL.*, P.C.**
347 Mount Pleasant Avenue, Suite 300
West Orange, New Jersey 07052
(973) 243-8600
Joseph J. DiPasquale
Henry M. Karwowski
Joshua H. Raymond
Special Counsel for Plaintiffs Dots, LLC, *et al.*

## <u>PRELIMINARY STATEMENT</u>

Chapter 11 Debtors Dots, LLC, IPC/Dots, LLC, and Dots Gifts, LLC (collectively, the "Debtors") seek the avoidance and recovery of certain preferential transfers made to Defendant Milberg Factors, Inc. ("Milberg," and collectively with Finance One, Inc. ("Finance One"), a related entity, "Defendants").

The Debtors now move for summary judgment on the application of the defenses in this proceeding.  The Debtors respectfully submit that summary judgment is appropriate because (a) the transfers were not made according to ordinary business terms, based on changes in the parties' credit relations during the preference period; (b) any extension of credit by Defendants to a vendor of the Debtors did not constitute new value; (c) any new value provided by Defendants did not remain unpaid; (d) any new value provided by Defendants was secured by a security interest in accounts; and (e) any new value provided by Defendants must be calculated on a de-coupled basis, and under such a calculation, Defendants' net preference liability is significant. Accordingly, the Debtors respectfully request that this Court grant their Motion.

## STATEMENT OF FACTS

### The Milberg-Finance One Relationship

Prior to the orderly liquidation of their business in the first half of 2014, the Debtors had been a leading retailer of clothing, accessories, and footwear for price-conscious women. Certification of Joseph Catalano in Support of Debtors' Motion for Partial Summary Judgment ("Catalano Certif.") ¶ 7.

Pursuant to various "Collection Date Factoring Agreements," Finance One clients, i.e., certain of the Debtors' vendors, agreed to sell, assign, and transfer to Finance One and Finance One agreed to purchase the clients' accounts, and Finance One had full power as "factor" to collect and otherwise deal with such accounts as the sole and exclusive owner thereof. Id. ¶ 8, Exh A.

Likewise, pursuant to various "Factoring Agreements," Milberg clients, i.e., certain of the Debtors' vendors, agreed to sell, assign, and transfer to Milberg and Milberg agreed to purchase the clients' accounts and Milberg had full power as "factor" to collect and otherwise deal with such accounts as the sole and exclusive owner thereof. Id. ¶ 9, Exh. B.

Pursuant to the Collection Date Factoring Agreements with Finance One and the Factoring Agreements with Milberg, Defendants' clients, i.e., various vendors of the Debtors, shipped goods to the Debtors and Defendants "factored" the clients' accounts due from the Debtors. Id. ¶ 10.

Milberg and Finance One are represented by the same law firm in the adversary proceedings pending against them. Id. ¶ 11. During the course of pre-trial proceedings before this Court, counsel for Milberg and Finance One acknowledged that Milberg, acting on behalf of Finance One, was in control of all credit decisions made by or on behalf of Finance One with

respect to the credit approval of orders placed by the Debtors with Finance One-factored vendors and the purchase by Finance One of the corresponding invoices from these vendors.  Id. Documents produced by Milberg confirm that Milberg included invoices factored in the name of Finance One as if they were part of Milberg's own direct credit exposure to the Debtors.  Id. Exh. C.  According to counsel for Milberg and Finance One, as a result of Milberg's control over the Finance One credit decisions and actions at issue here, Milberg bears responsibility for the defense and ultimate payment of any preference recovery obtained by the Debtors against Finance One.  Id. ¶ 11.  Thus, for purposes of this Motion, the Debtors treat Milberg as the party that made and controlled the credit decisions relating to the accounts factored by both Milberg and by Finance One.  Id.

**The Factoring Community Imposes Payment Pressure on the Debtors**

During the year prior to the January 20, 2014 "Petition Date" in these Chapter 11 Cases, the Debtors' liquidity was strained due to payment pressures from the factoring community – of which Defendants were a part – which provided factoring/financial accommodations to a significant portion – amounting to 70% percent or more – of the Debtors' vendors.  Id. ¶ 12. This payment pressure, which took a number of forms as set forth below, increased over time and adversely impacted the Debtors' liquidity, ability to meet obligations, and ability to maintain an adequate flow of inventory into its stores.  Id.  Although the factor did not enter into agreements, factoring or otherwise, with the Debtors, and did not actually extend any credit to the Debtors, the factors' pressure was ultimately a significant consideration in the Debtors' decision to file these Chapter 11 Cases.  Id.

Financial pressure from the factoring community began having an adverse impact on the Debtors' operations and performance as early as the beginning of 2013.  Id. ¶ 13.  By that time,

several factors had already implemented significant reductions in the amount of aggregate credit they made available to the Debtors' vendors, i.e., the maximum dollar amount of vendor invoices or the extension of other financial accommodations to vendors that a factor would make based upon its purchase of and taking a security interest in the accounts of the Debtors' vendors.  Id.

**Factors' Reduction of Credit Lines Forces the Debtors to "Anticipate" or Pre-Pay Invoices**

A factor's decision to reduce the amount of credit it made available to the Debtors' vendors had the effect of (i) reducing the amount of new inventory that the Debtors could purchase on credit from vendors whose accounts were being assigned to or financed by such factor; and (ii) accelerating the time period in which the Debtors had to pay for the goods that were the subject matter of such accounts.  Id. ¶ 14.  Once these reductions in credit availability were implemented by various factors, the Debtors, in order to maintain a historically consistent level of inventory purchases, were essentially forced to "anticipate" or pre-pay invoices earlier than their stated invoice credit terms required, in an effort to create credit availability that hopefully would cause the applicable factor to "credit approve" new orders with vendors which were assigning to or financing their accounts with such factor.  Id.  This pressure from factors to force the Debtors to make anticipation payments impacted the Debtors' purchase of inventory and led to significant disruption of the Debtors' business.  Id.

Thus, while vendors and their factors may have never formerly changed the printed credit terms on vendor's invoices, a factor's reduction in credit availability had the effect of shortening the time period in which the Debtors were forced to pay factored invoices and thereby unilaterally effected a *de facto* change in the credit terms between the Debtors and their vendors from the terms originally set forth in the underlying invoices.  Id. ¶ 15.

4

The only other way for the Debtors to maintain their required level of inventory purchases would have been to negotiate with each vendor to solicit its acceptance of orders from the Debtors, with the understanding that the respective factor with which the vendor had a relationship would not purchase the underlying invoice or make any other financial accommodation based on the security of such invoice.  Id. ¶ 16.  In such cases, the vendor would be forced to retain the credit risk on such non-credit approved transactions.  Id.

During the period from April to June 2013, the financial pressure from the factoring community appears to have been driven, in material part, by the concern of several factors that the Debtors were in danger of failing a liquidity covenant in their secured credit facility with Key Bank.  Id. ¶ 17.  The Debtors' records confirm that concerns over the possible breach of this covenant led to discussions with CIT Group ("CIT"), Rosenthal & Rosenthal ("Rosenthal"), and Milberg, several of the Debtors' largest factors, all of which had reduced, or were about to reduce or in some cases further reduce, their respective credit allocations to the Debtors' vendors.  Id.

For example, the Debtors' records confirm that Rosenthal's credit allocation with respect to the Debtors, which had been as high as $3.0 million at the end of 2012, was reduced to $2.0 million in January 2013, and then further reduced to $1.5 million in May-June 2013.  Id. ¶ 18.

Similarly, the Debtors' records reflect that in early 2013, CIT's credit allocation for the Debtors' vendors, which had been at least $7.0 million, if not higher, was reduced to $5.0 million in late spring-early summer 2013, and then further reduced to $4.0 million or less in October 2013.  Id. ¶ 19.

In the case of Milberg, discovery has disclosed the existence of a credit line as high as $2.0 million as of October 22, 2013 allocable to the Debtors' vendors.  Id. ¶ 20, Exh. D.  It

appears that this credit limit was thereafter reduced, in installments, to $1.5 million as of November 22, 2013 and thereafter to $750,000.00, and then to $500,000.00, and ultimately to $0.00 by the Petition Date.  Id.

The Debtors' business records reflect that on June 26, 2013, Maurice Sabony of Milberg informed Elaine Kapusta, the Debtors' CFO, that Milberg had "lowered [Debtors'] credit line." Id. ¶ 21, Exh. E.  While the exact dollar amount by which such credit line was lowered does not appear to have been disclosed to Ms. Kapusta, this statement confirms that the $2.0 million credit line as of October 22, 2013 was by no means the highest amount of credit allocated by Milberg to its vendors who were selling goods to the Debtors.  Id. ¶ 21.  In fact, the Debtors' records reflect that in March-April 2012, the Debtors had received shipments from Milberg-factored vendors totaling $4.1 million.  Id.  To have accommodated the receipt of $4.1 million in merchandise from Milberg-factored vendors within this two month period, the credit allocation made available to such vendors would have had to have been on a cumulative basis, well in excess of $5.0 million as of that point in time.  Id.  Similarly, in May 2013, the Debtors received from Milberg-factored vendors shipments totaling $3.5 million.  Id.  Assuming the Debtors were continuing to purchase from Milberg vendors and on-order purchase orders were being approved as requested, the receipt of this level of goods in a single month from these vendors would have required a credit allocation of as much as $4.5 million or more from Milberg.  Id.  These facts demonstrate that in the 12 to 18 months preceding the Petition Date, Milberg systematically reduced the credit that it made available to the Debtors' vendors.  Id.

### Factors' Termination of the Automatic Approval of Orders

By June 5, 2013, Milberg was one of several factors, including Rosenthal, Capital Business Credit, and Wells Fargo, which had cut off the automatic approval of the Debtors' orders and implemented a replacement process whereby the respective account managers had to credit approve every order on an order-by-order basis. Id. ¶ 22. This change in the credit approval process had the effect of further reducing the amount of credit that was made available to the Debtors' vendors and the level of inventory that the Debtors were able to purchase from such vendors. Id. ¶ 22, Exh. F. As of June 12, 2013, Milberg and other factors were still keeping the Debtors on a manual order-by-order credit approval process. Id. ¶ 22. This change in the process by which credit was allocated to the Debtors' vendors forced the Debtors to "anticipate" payments to Milberg, i.e., make payments before the invoice due date in order to free up availability under a reduced credit allocation. Id. ¶ 22, Exh. G. This is an example of a material change unilaterally imposed by Milberg in the way it managed its credit exposure to the Debtors that had the *de facto* effect of altering the credit terms printed on the invoices that had been negotiated between the Debtors and its vendors. Id. ¶ 22.

Thus, again, a mere review of payment terms shown on the invoices factored by Defendants does not fully disclose what actions, if any, were taken by Defendants to restrict the amount or payment terms under which credit was allocated to their clients, i.e., the Debtors' vendors, and thus, they should not be dispositive as to whether payments made by the Debtors to Defendants during the preference period were made in the ordinary course. Id. ¶ 23.

**The Factors Continue to Reduce Credit Allocated to the
Debtors' Vendors Even After the September Restructuring**

In an effort to resolve the issues regarding the Debtors' compliance with the liquidity covenant with Key Bank, on or about June 28, 2013, affiliates of the Debtors' equity interest holders purchased $4,875,000 in additional preferred units in IPC/Dots LLC. Id. ¶ 24. Thereafter, on September 12, 2013, the Debtors replaced their $37,000,000 term and revolving loans with Key Bank with a new Salus term loan of $16,000,000 and a Salus asset based revolver of $35,000,000. Id. As part of this refinancing (the "September Restructuring"), affiliates of the Debtors' equity interest holders made an additional $10,000,000 subordinated term loan to the Debtors. Id.

Immediately after the September Restructuring, the Debtors had $22,000,000 in excess availability under their secured credit facility. Id. ¶ 25. In September-October 2013, the Debtors used a substantial portion of these funds to make payments to factors with the expectation that the factors would at least partially restore credit availability to the Debtors' vendors to earlier levels and release approvals for new goods which were on order, but which were being held for "credit approval" because there was not sufficient credit availability allocated to the Debtors' vendors under the reduced credit allocations from the factors. Id.

In a written presentation announcing the results of the September Restructuring to their factoring community, the Debtors implored the factors for support. Id. ¶ 26, Exh. H ("We need you, as factors, to support the Company and honor the normalized payment terms that we have arranged with our vendors."). The Debtors sought to prevail on the factors to refrain from using reductions in their credit allocations to the Debtors' vendors as an indirect means of continuing to force anticipation payments and thereby continuing to override and arbitrarily restate the payment terms that the Debtors had negotiated with their vendors. Id. ¶ 26.

8

Even though the Debtors had used a significant portion of the availability generated by the September Restructuring to make payments to the factors, the factors continued to impose payment pressures on the Debtors.  Id. ¶ 27.  Indeed, the factors left their credit allocations at the already constricted levels, or as in the case of Milberg and others, further reduced credit allocations and thereby continued to force the Debtors into anticipating and pre-paying invoices for goods already received in order to free up credit approvals for goods on order.  Id.

At the time of the September Restructuring, the Debtors expected that their payments to the factors would cause them to extend, reinstate, or restore more favorable credit allocations to the Debtors' vendors and that the Debtors' accounts payable would increase as a result of the availability of more credit allocated by the factors to the Debtors' vendors.  Id. ¶ 28. Unfortunately, the exact opposite occurred.  Id.  After the September Restructuring, the Debtors instead suffered a net reduction in their accounts payable by virtue of the payments made to the factors and the absence of any corresponding increase in the credit availability made to the Debtors' vendors.  Id.

With respect to Defendants in particular, an internally-prepared analysis of merchandise payments for October 2013 showed payments to Milberg of $778,118 and additional payments to Finance One of $479,660, of which 33.8% or $425,128.96 (of the total amounts paid to Milberg and Finance One) were "anticipated" or forced to be paid early.  Id. ¶ 29.  This analysis shows that Milberg was continuing to require early payments at the end of the month.  Id. Exh. I.

As a result, throughout the preference period, the Debtors were left in the position of having to anticipate or pre-pay an ever increasing dollar amount of their accounts payable due to Defendants and other factors, even though the payment terms on the underlying invoices had never changed.  Id. ¶ 30.  Given the factors' pervasive reductions in the credit allocations made

available to the Debtors' vendors, the factors and/or their respective vendors did not have to bother to change the printed credit terms on their invoices in order to impose extraordinary credit pressure.    Instead, it was sufficient to simply reduce the credit that was allocated to vendors' invoices, and in so doing, unilaterally force the Debtors to pay invoices in advance of their due dates in order to get other "on order" goods credit-approved.  Id.

**The Debtors Seek Avoidance of Preferential Transfers to Defendants**

On January 20, 2014, the Debtors each filed a Chapter 11 Petition in this Court.

On October 1, 2014, the Debtors filed against Milberg a Complaint pursuant to which the Debtors to avoid and recover payments in the aggregate amount of $2,743,889.34 made to Milberg in the preference period.  Compl. (ECF 1).

On July 24, 2016, this Court, in response to the parties' request, set a briefing schedule to allow the parties to move for summary judgment on the following issues: (1) "[t]he scope of matters to be considered under the objective (ordinary business terms defense) of 11 U.S.C. § 547(c)(2)(B)"; (2) "[w]hether a court, in calculating a preference defendant's liability, if any, should apply the defendant's affirmative defenses under 11 U.S.C. § 547(c) in any particular order"; and (3) "[w]hether the extension of credit by a factor to an underlying vendor can constitute new value, as defined in 11 U.S.C. § 547(a)(2), and if so, in order to satisfy 11 U.S.C. § 547(c)(4), whether" (a) "the new value must remain unpaid"; (b) the new value (in the form of an extension of credit by the factor) is secured by an otherwise unavoidable security interest in debtor's receivables"; and (c) "under the circumstances of this case, should such new value be calculated on a de-coupled or coupled basis."

## <u>LEGAL ARGUMENT</u>

### <u>THE DEBTORS ARE ENTITLED TO SUMMARY JUDGMENT ON DEFENDANTS' "ORDINARY COURSE" AND "NEW VALUE" DEFENSES.</u>

The Debtors now move for summary judgment on the application of the "ordinary course" and "new value" defenses asserted by Finance One in this proceeding.

### <u>Applicable Standard</u>

Federal Rule 56(a), which is incorporated by Bankruptcy Rule 7056, provides in relevant part that a party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought, and that the court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.   Fed. R. Bankr. P. 7056 (incorporating Fed. R. Civ. P. 56(a)).

As this Court has observed, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" <u>Stalford v. Haberl (In re Haberl)</u>, 2012 WL 3815562 at *1 (Bankr. D.N.J. Sept. 4, 2012) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986)).

Issues of material fact are those "that might affect the outcome of the suit under the governing law."  <u>Id.</u> at *2 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). An issue is genuine when it is "triable," that is, when reasonable minds can disagree on the result.  <u>Id.</u> (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citations omitted)).

After the movant establishes the absence of a genuine issue as to any material fact, the burden shifts to the non-movant to do more than simply show the existence of some

11

metaphysical doubt as to the material facts.  Id. (quoting Matsushita, 475 U.S. at 586).  A non-movant will not defeat a motion for summary judgment unless it sets forth specific facts, in a form admissible in evidence, establishing the existence of a genuine dispute of material fact for trial.  Id. (quoting former Fed. R. Civ. P. 56(e), now Fed. R. Civ. P. 56(c)(4)).  If the non-movant's evidence is a mere scintilla or is not significantly probative, the court may grant summary judgment.  Id. (quoting Liberty Lobby, 477 U.S. at 249–50).  The non-movant will prevail only if the evidence produced is of sufficient quantum and quality to allow a rational and fair-minded fact finder to return a verdict in his favor.  Id.

Here, no genuine issue as to any material fact regarding the "ordinary course" and "new value" defenses exists.  Also, as set forth below, the Debtors are entitled to judgment as a matter of law because (a) the transfers were not made according to ordinary business terms, based on changes in the parties' credit relations during the preference period; (b) any extension of credit by Defendants to a vendor of the Debtors did not constitute new value; (c) any new value provided by Defendants did not remain unpaid; (d) any new value provided by Defendants was secured by a security interest in accounts; and (e) any new value provided by Defendants must be calculated on a de-coupled basis, and under such a calculation, Defendants' net preference liability is significant.  Accordingly, summary judgment in favor of the Debtors is warranted.

**A.    The transfers were not made according to ordinary business terms, based on changes in the parties' credit relations during the preference period.**

Bankruptcy Code section 547(c)(2) provides as follows:

> (c) The trustee may not avoid under this section a transfer –
>
> (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was –

12

(A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or

(B) made according to ordinary business terms.

11 U.S.C. § 547(c)(2).

The creditor-transferee bears the burden of proving the "ordinariness" of a transfer under this section.  11 U.S.C. 547(g); United States Trustee v. First Jersey Secs. (In re First Jersey Secs.), 180 F.3d 504, 512 (3d Cir. 1999).

In order to determine whether a transfer was made according to ordinary business terms under subpart (B) under section 547(c)(2), the court uses an objective, industry-wide perspective. Kellman v. P.S.E. & G. (In re Jolly "N", Inc.), 122 B.R. 897, 906 (Bankr. D.N.J. 1991).  The Third Circuit has interpreted the expression "ordinary business terms" to encompass "the practices in which firms similar in some general way to the creditor in question engage."  First Jersey, 180 F.3d at 513.  Thus, evidence of the relevant industry norm is required.  Risk Mgmt. Alternatives, Inc. v. Scharffenberger (In re Allegheny Health Educ. & Research Found.), 127 Fed.Appx. 27, 28 (3d Cir. Mar. 11, 2005) (holding that defendant was required to introduce evidence that disputed payments were not unusual by relevant standard of the industry).  See also Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.), 78 F.3d 30, 43 (2d Cir. 1996) ("[T]he behavior of the parties cannot be sufficient in and of itself to sustain the creditor's burden of proof with respect to ordinary business terms in the industry.").

More specifically, the Third Circuit has expressly held that a court determining the application of the defense must as part of its analysis inquire into whether the relationship between debtor and transferee remained relatively stable leading into and throughout the insolvency period.  Fiber Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.), 18 F.3d 217, 227 (3d Cir. 1994).  More specifically, the Third Circuit

referred to "potential manipulation of the credit schedules" or other unusual behavior as factors in the analysis. Id. at 225.

Thus, the parties' pre-petition relationship, including credit issues such as the imposition of a "credit hold," is in fact directly relevant under the "ordinary business terms" test. See, e.g., Universal Forest Products Inc. v. Hechinger Inv. Co. of Del. Inc. (In re Hechinger Inv. Co. of Delaware Inc.), 339 B.R. 332, 336-37 (D. Del. 2006) (holding that defendant failed to prove that bankruptcy court had erred in concluding that transfers had not been made according to ordinary business terms, where defendant had imposed credit limit, which was not normal practice in defendant's relationships with large retail customers like debtor), aff'd in part, vacated in part, remanded by, 489 F.3d 568 (3d Cir. 2007); Medimaging Tech., Inc. v. Mallinckrodt, Inc. (In re Medimaging Tech., Inc.), 2007 WL 3024068, at *13 (Bankr. D. Md. Oct. 12, 2007) ("The placement of a credit hold on the [debtor's] account unless and until the transfers at issue were made indicates that [defendant] had knowledge of the debtor's financial straits and that pressure was exerted by [defendant] to force the debtor to make the contested payments.  The fact that any one or all of the transfers in question were made at a point when [defendant] had placed the debtor on credit hold, which is the sort of unusual collection activity by a creditor that cannot be considered to be in the ordinary course dealings with a debtor or in an industry, precludes the granting of summary judgment to [defendant].");  Interex, Inc. v. Virtex (In re Interex, Inc.), 2003 WL 23807973, at *5 (Bankr. D. Kan. Apr. 16, 2003) ("The Court finds that [defendant] has failed to meet its burden to prove that the payments were made according to ordinary business terms. . . . [The debtor's] payments to [defendant] were only made because [defendant] put [debtor] on a credit hold and refused to ship any further products. [The debtor] in turn made large, lump sum payments to [defendant] to pay off past due invoices so it could continue to

purchase products.  In absence of any evidence to the contrary, the Court finds that making large, lump sum payments on past due invoices under these circumstances is not 'the kind of terms that creditors and debtors use in ordinary circumstances, when debtors are healthy.'").

It follows that, here, the past relationship between the Debtors and Defendants, and any credit issues between them, including any credit hold imposed by Defendants, is relevant to determining whether the transfers at issue were made according to ordinary business terms in the industry.  As set forth in detail above, institutions that factored the Debtors' vendors' accounts receivable imposed pressure for payment in the period preceding the bankruptcy filings. Catalano Certif. ¶¶ 12-30.  Milberg, which controlled all credit decisions made by or on behalf of Finance One with respect to the credit approval of orders placed by the Debtors with Finance One-factored vendors and the purchase by Finance One of the corresponding invoices from these vendors, was one of these factors.  Id. ¶¶ 11, 14-17, 27-30.  Thus, insofar as the Debtors may have made early payments, even before their stated due date, the Debtors did so only because of the pressure imposed by Defendants.  As set forth in detail above, the payment pressure, which took a number of forms, including changes in credit lines available to the Debtors' vendors, increased over time and adversely impacted the Debtors' liquidity, ability to meet obligations, and ability to maintain an adequate flow of inventory into its stores.  Id. ¶ 12.

Finance One itself previously raised the issue of the parties' payment history in connection with its argument that the ordinary business terms applied.  Defendant's Statement of Undisputed Facts (ECF 20-3) ¶ 3 ("There was no difference in the business terms applicable to the business between Finance One and the Debtors before and during the preference period." (citing Kim Decl. ¶ 5)); Defendant's Brief in Support of Motion for Sanctions (ECF 21-1) at 5 ("This is consistent with the way the parties transacted business both before and during the

preference period and the payments were on ordinary business terms."). In so doing, Finance

One conceded the relevance of the parties' relationship to the defense.

Given the relevance of these credit issues, Defendants cannot prevail under section

547(c)(4). It follows that the Debtors are entitled to summary judgment on this issue.

**B.**    **Any extension of credit by Defendants to a vendor did not constitute new value.**

Bankruptcy Code section 547(c)(4) provides as follows:

> (c) The trustee may not avoid under this section a transfer –
>
> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor –
>
>> (A) not secured by an otherwise unavoidable security interest; and
>>
>> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor. . . .

11 U.S.C. § 547(c)(4).

The creditor bears the burden of proof on the "new value" defense.[1]  11 U.S.C. § 547(g);

Schubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.), 554 F.3d 382, 402 (3d Cir.

2009).

_____

[1] Courts in this Circuit, in calculating a defendant's preference exposure, first apply the new value defense, and then the ordinary course defense. See, e.g., Burtsch v. Detroit Forming, Inc. (In re Archway Cookies LLC), 511 B.R. 726, 727 (D. Del. 2013) ("The Trustee ultimately acknowledged that [defendant] had provided unpaid new value to the Debtors in [certain] amount . . . leaving the parties' dispute limited to whether the remaining [amount] of transfers to [defendant] were protected by the ordinary course of business defense set forth in § 547(c)(2)(A)." (footnote omitted)); Forman v. Moran Towing Corp. (In re AES Thames, LLC), 547 B.R. 99, 102 (Bankr. D. Del. 2016) ("The parties agree that [defendant] provided the [d]ebtor with [certain amount] of unpaid new value pursuant to Bankruptcy Code § 547(c)(4), leaving a balance of [certain amount], prior to application of any ordinary course of business defense under § 547(c)(2)(A)."); Burtch v. Opus, LLC (In re Opus East, LLC), 528 B.R. 30, 94-100 (Bankr. D. Del. 2015) (applying new value analysis before ordinary course analysis in

By its terms, section 547(c)(4) provides that new value can derive only from the creditor which received or benefited from the preferential transfer.  11 U.S.C. § 547(c)(4) (providing that trustee may not avoid transfer "to or for the benefit of a creditor, to the extent that . . . *such creditor* gave new value" (emphasis added)); First Sec.-Bank, NA v. Davis (In re Telsave Corp.), 116 Fed.Appx. 91, 92 (9th Cir. Oct. 27, 2014) ("Finally, [defendant] FSB's new value defense (11 U.S.C. § 547(c)(4)) argument fails because the text of the statute requires that the transfer of new value must be from *such* creditor to whom the alleged preferential transfer was made.  The creditor-transferee, not a third party, must be the one to extend new value to the debtor.  Given the lack of legal authority to support it, FSB fails to convince us that this defense should be extended to transfers of alleged new value made by third parties other than the creditor-transferee.").

Thus, a creditor that has merely purchased accounts receivable from a debtor's vendors pursuant to a factoring agreement does not extend new value when it continues to purchase accounts receivable from the debtor's vendors.  See, e.g., Country Junction, Inc. v. Money Exch. (In re Country Junction, Inc.), 49 B.R. 708, 709-10 (Bankr. W.D. Tex. 1985), vacated pursuant to settlement, 1987 WL 49438 (5th Cir. Aug. 3, 1987).  The Country Junction Court reasoned:

> The statute requires that the "new value" be extended by the same creditor which received the benefit of the preference payments. Republic Factors [the defendant-factor] never extended any new value to the Debtor, but merely *became* a creditor by the purchase of accounts receivable.

---

preference proceeding).  Moreover, a court must deny application of the new value defense if the transfer and an extension of new value occur on the same date and the defendant cannot actually prove that it had given the new value *after* the transfer on that date.  See, e.g., Henderson v. Allred (In re Western World Funding, Inc.), 54 B.R. 470, 479 n.5 (Bankr. D. Nev. 1985) (denying § 547(c)(4) defense, in case in which a transfer and an extension of new value had occurred on the same date, on the basis that the creditors could not establish that they had given the new value *after* the transfer).

The "new value" exception of § 547(c) has been applied to transactions between immediate parties but has never been expanded to allow an entity such as Republic Factors to receive credit for goods which it did not advance. Such an expansion would not be warranted in this case.

Republic Factors never entered into any credit arrangement with Country Junction, Inc. Instead, it was a party to factoring agreements between itself and the various vendors. These agreements provided for the assignments of receivables arising from sales by the vendors. The factoring agreement, by its express terms, is solely for the benefit of the parties to the agreement; it did not have as its purpose the extension of credit to the Debtor. A vendor was given immediate money for its accounts receivable. In exchange, Republic Factors was entitled to collect the face amount of the receivable although it paid the vendor only 98.875% of the face amount. The very nature of this arrangement was to provide financing by Republic Factors to a vendor in exchange for anticipated payments upon the receivables. Although the record indicates that Republic Factors monitored the Debtor's financial condition, there is no evidence of any contractual relationship between Republic Factors and the Debtor. The purchase by Republic Factors of an accounts receivable does not constitute an extension of credit to the Debtor.

Id. at 708-09 (citations omitted).

The court held further that application of the defense in such a circumstance would violate the Bankruptcy Code. The court found:

The [d]efendant argues that subsequent extensions of credit by *other* vendors and the purchase of the accounts receivable arising out of those sales by it should be viewed as "new value." Republic Factors is seeking to offset a claim it *purchased* within the ninety (90) days preceding the commencement of the case while the Debtor was insolvent. This position is not consistent with the language of § 547(c) of the Bankruptcy Code and is also contrary to § 553(a)(2) which prohibits a creditor from offsetting a debt to the Debtor with a claim which "was transferred, by an entity other than the debtor, to such creditor after ninety (90) days before the date of filing of the petition."

Id. at 710.

Finally, although the court noted that the defendant had failed to prove that its purchase of accounts receivable had benefited the debtor, on the basis that a substantial number of the accounts had been factored "with recourse," i.e., without the defendant's approval, and hence, with no credit risk to the defendant, the court still found, as to the "without recourse" accounts, that nothing in the record indicated that the vendors for these accounts would not have sold goods to the debtor without the defendant's prior written approval, or for that matter, if there had been no factoring agreements at all.  Id.

Other courts and commentators have reached a similar conclusion.  See, e.g., Autonation, Inc. v. Knupfer (In re Maron & Davis Advert., Inc.), 2007 WL 7511954, at *13 (9th Cir. B.A.P. Mar. 12, 2007) (declining to apply new value defense on grounds that defendant had offered no evidence that debtor had received any money, goods, services, or new credit from defendant after transfers in question; and defendant acknowledged that it was not a provider of goods and services to debtor, and that in fact, instead, it was a third party, not defendant, to which the debtor was contractually obligated to pay for the value); Richard M. Cieri, Considerations for Chapter 11 Retail Debtors, 6 J. Bankr. L. & Prac. 451, 472 (July/August 1997) ("If goods were received by the debtor within this [preference] period, the factor may argue that the new value exception set forth in Section 547(c)(4) of the Bankruptcy Code saves the payments from avoidance.  However, because the goods received by the debtor were not delivered from the factor, a court may find that the new value exception is inapplicable and order the avoidance of the prepetition payment.").

The same type of arrangement existed here.  In short, Defendants did not have a contractual relationship with the Debtors. Catalano Certif. ¶¶ 8-12.  Instead, they merely factored accounts receivables of the Debtors' third-party vendors.  Id.  Thus, Defendants never

19

provided new value to the Debtor.  Instead, it was the vendors who provided the value to the

Debtors.  Finance One has admitted this fact.  Specifically, Mr. Stephen Kim, Finance One's

Senior Vice President, asserted in a Certification that Finance One had provided new value to the

Debtors' clients, and that the Debtors had received new value in the form of "goods provided,"

presumably from the Debtors' vendors.  Kim Decl. (ECF 20-2) ¶ 2.  He did not assert or even

suggest that Finance One had provided new value directly to the Debtors.  Thus, Defendants

cannot prevail under section 547(c)(4).  It follows that the Debtors are entitled to summary

judgment on this issue.

**C.    Any new value provided by Defendants did not remain unpaid.**

The Third Circuit requires that, for purposes of the new value defense, subsequent

advances *remain unpaid*.  New York City Shoes, Inc. v. Bentley Int'l, Inc. (In re New York City

Shoes, Inc.), 880 F.2d 679, 680 (3d Cir. 1989) ("[T]he debtor must not have fully compensated

the creditor for the 'new value' as of the date that it filed its bankruptcy petition.").  Other circuit

courts, most recently the Seventh Circuit this past summer, also impose this requirement.  See,

e.g., Unsecured Creditors Comm. of Sparrer Sausage Co. v. Jasons's Foods, Inc., 826 F.3d 388,

397 (7th Cir. 2016); Charisma Inv. Co., N.V. v. Airport Sys., Inc. (In re Jet Florida Sys., Inc.),

841 F.2d 1082, 1083 (11th Cir. 1988).

Applying the New York City Shoes standard, courts within this Circuit strictly apply this

requirement.  See, e.g., Stanziale v. Car-Ber Testing, Inc. (In re Conex Holdings, LLC), 534 B.R.

606, 610 (D. Del. 2015) ("Section 547(c)(4)(B) . . . limits the creditor's 'new value' if the debtor

subsequently paid for that value."); Archway Cookies, 511 B.R. at 727 (noting that "[t]rustee

ultimately acknowledged that [defendant] had provided unpaid new value to the Debtors in

[certain] amount"); AES Thames, 547 B.R. at 102 (noting that "[t]he parties agree that

[defendant] provided the [d]ebtor with [certain amount] of unpaid new value pursuant to Bankruptcy Code § 547(c)(4)"); <u>Opus East, LLC</u>, 528 B.R. at 95 (applying new value "that has not been paid"); <u>McMackin v. Willwork, Inc.</u>, 2007 WL 4264516, at *5 (Bankr. D.N.J. Dec. 3, 2007) ("[T]he third element has been met, i.e., that any 'new value' received by the debtor from the defendant as of the date of the bankruptcy filing was not fully compensated by the debtor."); <u>Homeplace of Am., Inc. v. Salton, Inc. (In re Waccamaw's Homeplace)</u>, 325 B.R. 524, 535 (Bankr. D. Del. 2005) ("The parties agree that Salton provided $284,497.82 in new value during the preference period that remained unpaid as of the Petition Date. Therefore, under Third Circuit precedent, Salton is entitled to a setoff in this amount." (citations omitted)); <u>Claybrook v. SOL Bldg. Materials Corp. (In re US Wood Products, Inc.)</u>, 2004 WL 870830, at *3 (Bankr. D. Del. Apr. 22, 2004) ("Here, the [d]efendant admits that it received all of the goods it had ordered from the Debtor and that the payments were on account of the outstanding balances. Therefore, even if we were to agree that the [d]efendant provided 'new value' to Debtors, the 'new value' defense is not available because the [d]efendant was fully compensated for those payments."); <u>Quad Sys. Corp. v. H & R Indus., Inc. (In re Quad Sys. Corp.)</u>, 2003 WL 25947345, at *16 (Bankr. E.D. Pa. July 15, 2003) ("[A]ll of these shipments were made on a 'cash on delivery' basis and, therefore, have been paid in full. Thus, § 547(c)(4) would not apply to these shipments."); <u>Ross v. Phila. Housing Auth. (In re Ross)</u>, 1997 WL 331830, at *7 (Bankr. E.D. Pa. June 10, 1997) ("I am satisfied that the third and final element of the new value exception is satisfied in this case. PHA's extension of new value to the Debtor was never compensated."); <u>Sacred Heart Hosp. of Norristown v. Santangelo Hauling, Inc. (In re Sacred Heart Hosp. of Norristown)</u>, 1996 WL 432296, at *1 (Bankr. E.D. Pa. July 30, 1996) ("The [d]efendant correctly argues that 11 U.S.C. § 547(c)(4) provides a defense equal to the new value of services

21

billed and unpaid after the February payment."); <u>Miller v. Lewmar Paper Co. (In re Lila, Inc.)</u>,
1993 WL 62382, at *2 (Bankr. E.D. Pa. Mar. 5, 1993) ("The [d]efendant's witness credibly
testified that it delivered paper orders invoiced at a total of $76,761.37 to the Debtor between
December 6, 1990, and December 13, 1990, for which it has never been paid. . . . These
deliveries meet the requirements for § 547(c)(4), as to a portion of the December 3, 1992,
payments."); <u>Lease-A-Fleet, Inc. v. Morse Operations, Inc. (In re Lease-A-Fleet, Inc.)</u>, 141 B.R.
853, 864 (Bankr. E.D. Pa. 1992) ("It is clear, as noted in the court's recitation of the third
prerequisite for invocation of § 547(c)(4) [in <u>New York City Shoes</u>], that § 547(c)(4) can be
invoked only as to 'new value' which has not been subsequently paid for by the Debtor."); <u>Data
Tech Indus., Inc. v. Ames (In re Data Tech Indus., Inc.)</u>, 1992 WL 37500, at *3 (Bankr. E.D. Pa.
Feb. 21, 1992) ("Assuming *arguendo* that Ames received a preferential payment, he clearly
advanced his services to the Debtor after each of the payments in issue, and the Debtor has not
met its burden of proving that Ames was ever fully compensated for his past services.  Therefore,
the elements of this [new value] defense are made out."); <u>Committee of Unsecured Creditors v.
ITT Commercial Fin. Corp. (In re St. Joseph's Hosp.)</u>, 1991 WL 38981, at *3 (Bankr. E.D. Pa.
Mar. 20, 1991) ("In each of the months following the payments in issue, the [d]efendant arguably
provided 'new value' by leaving the equipment leased in place with the Debtor.  However, the
rentals for each of the months following the respective payments in issue were ultimately made,
thus eliminating the presence of the third of the three requirements for successful invocation of §
547(c)(4).").

Moreover, while the Third Circuit more recently held that a certain portion of the <u>New
York City Shoes</u> opinion is dicta, <u>Friedman's Liquidating Trust v. Roth Staffing Co. LP (In re
Friedman's Inc.)</u>, 738 F.3d 547, 551 (3d Cir. 2013) (addressing issue of when "an otherwise

avoidable transfer" is made after petition filing), the Third Circuit has not overruled or addressed the "remain unpaid" portion of its opinion in <u>New York City Shoes</u>.  If anything, the Third Circuit's ruling in <u>Friedman's</u> actually conformed to its position regarding new value in <u>New York City Shoes</u>, and in fact, converted such position, with the exception of the "remains unpaid" portion, into binding precedent.  <u>Miller v. JNJ Logistics LLC (In re Proliance Int'l, Inc.)</u>, 514 B.R. 426, 432 ns. 24-25 (Bankr. Del. 2014).  Thus, <u>Friedman's</u> actually supports the Debtors' position.

Further, even assuming that the Third Circuit's statement in <u>New York City Shoes</u> constitutes dicta, it is nevertheless entitled to considerable deference.  <u>See</u>, <u>e.g.</u>, <u>Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery</u>, 330 F.3d 548, 561 (3d Cir. 2003) ("[W]e should not idly ignore considered statements the Supreme Court makes in dicta." (quoting <u>In re McDonald</u>, 205 F.3d 606, 612-13 (3d Cir. 2000))); <u>Acme, Inc. v. Besson</u>, 10 F. Supp. 1, 3 (D.N.J. 1935) ("It is . . . proper, where the higher courts have not specifically passed upon a point, to consider such obiter dicta as may be found in their opinions, to the end that its logic may be considered and perhaps point the intent of the higher courts.").

Here, the Debtors sent several substantial checks to Milberg in mid-December 2013 and in January 2014, near the end of the preference period.  Compl. (ECF 1) Exh. A (referring to payments made by the Debtors late in preference period).  Therefore, Defendants' purported new value did not remain unpaid under the <u>New York City Shoes</u> standard.  It follows that the Debtors are entitled to summary judgment on this issue.

**D.   Any new value provided by Defendants was
secured by a security interest in accounts.**

Under section 547(c)(4)(A), new value cannot be secured by an otherwise unavoidable security interest.  Or more simply, as the Third Circuit has observed, any new value must be advanced on an unsecured basis.  Winstar, 554 F.3d at 402 (citing New York City Shoes, 880 F.2d at 680).  Citing this requirement, the Third Circuit has rejected the new value defense where any new value was provided on a secured basis.  Id. at 402-04 (holding that defendant failed to carry burden of proof on new value defense because defendant's new value was secured).

Thus, transfers secured by a security interest in accounts do not constitute new value. See, e.g., Armstrong v. Liberty Nat'l Bank (In re Queen City Servs., Inc.), 1991 WL 1301308 at *7 (Bankr. D.N.D. Oct. 29, 1991) (holding that defendant failed to meet burden of proof on new value defense because defendant's advances were secured by debtor's accounts); Cullen v. TDK Electronics Corp. (In re Antinarelli Enters., Inc.), 76 B.R. 247, 251 (Bankr. D. Mass. 1987) (holding that debtor did not receive new value from supplier in exchange for transfer, where transfer was secured by security interest in accounts).

Here, insofar as Defendants, as admitted factors of accounts payable by the Debtors to their vendors, provided new value, such new value, in the form of new credit, was secured by the accounts.  Catalano Certif. Exh. A § 7, Exh. B § 4.  It follows that the Debtors are entitled to summary judgment on this issue.

**E.      Any new value provided by Defendants must be calculated on a de-coupled basis, and under such a calculation, Defendants' net preference liability is significant.**

Even assuming that this Court declines to adopt the Debtors' new value arguments above, Defendants' net preference liability, even after accounting for new value, remains considerable.

In a three-party relationship where the debtor's preferential transfer to a third party benefits the debtor's creditor, new value analysis can consider only new value provided by *that* creditor, and it cannot consider new value provided by other creditors.  Or put another way, in such a relationship, new value analysis must be conducted on an individual creditor basis.  See, e.g., Stoebner v. San Diego Gas & Elec. Co. (In re LGI Energy Solutions, Inc.), 746 F.3d 350, 356-57 (8th Cir. 2014) (holding that appellate panel correctly concluded that utilities, to which debtors made payments to pay outstanding invoices of two of debtor's customers, could each offset new value that *each* customer paid to debtor for that utility's service, and thus, affirming panel's new value analysis conducted separately for each customer, with exception of inadvertent clerical error which wrongly inflated one utility's preference liability, as preferential transfers on behalf of one customer could not increase utility's preference liability for transfers on behalf of other customer); Stoebner v. San Diego Gas & Elec. Co. (In re LGI Energy Solutions, Inc.), 482 B.R. 809, 822 n.26 (B.A.P. 8th Cir. 2012) (conducting separate new value analysis for each customer-creditor), aff'd, 746 F.3d 350 (2014).

Thus, in the context of factoring, which involves a three party relationship in which a debtor paid a factor for goods provided by separate, individual vendors, a new value analysis must be conducted on an individual vendor basis.  Or put more simply, a factor may not use new value provided by Vendor A to offset a payment made on account of goods provided by Vendor B.  Indeed, vendors themselves cannot invoke new value provided by other vendors.

25

Here, under an analysis of new value provided by each individual vendor, "de-coupled" from other vendors, Defendants' preference exposure is substantial.

Further, insofar as Defendants argue that they viewed the accounts purchased from the Debtors' vendors as essentially one account of the Debtors, rather than the many separate accounts of the vendors, such allegation is belied by the record, which shows that Defendant had a contractual relationship with each vendor rather than the Debtors, and that Defendants and each vendor did business on an individual invoice basis.  Thus, for this additional reason, any new value analysis must be conducted on a vendor-by-vendor basis.

Accordingly, the Debtors are entitled to summary judgment on this issue.

## CONCLUSION

Based upon the foregoing, the Debtors respectfully request that this Court grant their

Motion and such relief as this Court deems just and equitable.

Respectfully submitted,

**TRENK, DIPASQUALE, *ET AL.*, P.C.**
Special Counsel for Plaintiffs Dots, LLC, *et al.*

By:   /s/ *Henry M. Karwowski*
Henry M. Karwowski

Dated: September 16, 2016

4827-4348-1400, v. 1

27